2018 PA Super 231

| ROBERT M. DUNLAP | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| Appellant | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| FEDERAL SIGNAL CORPORATION | : | |

*****

| DINO ABBOT | : | |
|---|---|---|
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| FEDERAL SIGNAL CORPORATION | : | |

*****

| KEITH BRADLEY | : | |
|---|---|---|
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| FEDERAL SIGNAL CORPORATION | : | |

*****

| BRIAN CAVANAUGH | : | |
|---|---|---|
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| FEDERAL SIGNAL CORPORATION | : | |

*****

| GLENN GASIOROWSKI | : | |
|---|---|---|
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| FEDERAL SIGNAL CORPORATION | : | |

*****

J-A18023-17

ROGER MAHER                            :
      Appellant                    :
                                   :
      v.                           :
                                   :
FEDERAL SIGNAL CORPORATION             :

                            \*\*\*\*\*

CARL ROELL                             :
      Appellant                    :
                                   :
      v.                           :
                                   :
FEDERAL SIGNAL CORPORATION             :      No. 1747 WDA 2016

Appeal from the Order Entered October 21, 2016
In the Court of Common Pleas of Allegheny County, Civil Division,
Nos. GD-13-006083, GD-13-009820, GD-13-010550, GD-13-013251

BEFORE:  BOWES, J., LAZARUS, J., and OTT, J.

DISSENTING OPINION BY LAZARUS, J.:      **FILED  AUGUST 20, 2018**

      I am constrained to disagree with the learned Majority's conclusion that this Court's decision in **Webb** definitively reestablished a bright line evidentiary rule barring evidence of a product's compliance with governmental and/or industry standards.  Therefore, I respectfully dissent.

      Prior to **Tincher**, Pennsylvania courts had long prohibited *defendants* from including governmental and industry standard evidence in cases that implicated a so-called cost/risk-benefit analysis.  In **Lewis**, our Supreme Court determined that evidence of industry standards relating to the design of a product in strict products liability cases creates a strong likelihood of diverting the jury's attention away from the product to the reasonableness of

- 2 -

the manufacturer's conduct in choosing its design. Later, in **Gaudio**, this Court similarly held that manufacturers could not attempt to prove the quality of the design of their product by showing that it comports with industry or governmental standards or is in widespread industry use. However, as the Majority correctly states, the **Lewis** and **Gaudio** Courts premised these evidentiary rules on **Azzarello**, which strictly prohibited the introduction of negligence concepts into strict liability claims. Later, the **Tincher** Court concluded that the firm division between strict liability and negligence concepts no longer exists and reopened the question of whether the prohibition against governmental and industry standard evidence was still valid.

Following **Tincher**, the **Webb** Court revisited whether courts must prohibit defendants from presenting evidence of governmental or industry standard evidence in strict liability cases. The plaintiff in **Webb** was involved in a fatal automobile crash between a 1997 Volvo sedan and another vehicle. Webb, like Maher and Roell here, sued Volvo Cars of North America on various theories of liability, including both negligence and strict product liability, alleging the Volvo sedan was defective because it lacked rear door bars to prevent side-impact intrusion during a side-impact collision. Following a jury trial, the trial court entered non-suit on Webb's negligence claim against Volvo and later directed a verdict in favor of Volvo on Webb's strict product liability claim. In doing so, the trial court allowed the jury to consider Federal Motor Vehicle Safety Standards ("FMVSS") evidence proffered by Volvo while

deliberating Webb's strict product liability claim, over Webb's objection. On appeal, Webb argued that governmental standard evidence, i.e., the FMVSS evidence proffered by Volvo, became irrelevant to Webb's strict product liability claim after the negligence claim was non-suited. The **Webb** Court determined that the trial court erred in permitting the jury to consider FMVSS evidence in connection with Webb's strict product liability claims. Specifically, the Court concluded that the acknowledgement of the commonalities between strict product liability and negligence theory, as stated in **Tincher**, does not provide a sufficient basis for disregarding the evidentiary rules expressed in **Lewis** and **Gaudio** prohibiting governmental and industry standard evidence in strict product liability cases. The Majority believes the **Webb** Court, in stating that **Tincher** did not provide "a sufficient basis for disregarding the evidentiary rule expressed in **Lewis** and **Guadio**," definitively reestablished a bright line rule barring governmental/industry standard evidence in strict product liability cases. I disagree.

I believe that, contrary to the Majority's assertion, the **Webb** holding is narrow and does not sufficiently discuss the negligence and strict liability principles underlying the evidentiary rule barring governmental/industry standard evidence. To the extent that the **Webb** Court discusses its rationale for barring the FMVSS evidence proffered by Volvo, it states only that **Tincher** does not undermine the rationale that that "a defective design could be widespread in an industry." **Webb**, 148 A.3d at 483. The Majority echoes this in its opinion. However, the **Webb** Court goes on to say that

- 4 -

[w]hile it is clear after *Tincher* that the firm division between strict liability and negligence concepts no longer exists, *it is not clear that the prohibition on evidence of government or industry standards no longer applies.*

*. . .*

*It is possible that government/industry standards could be admissible under [the consumer expectation and risk-utility] theories[.] . . . It is also possible that the admissibility of such evidence will depend upon the circumstances of a case*.

*Webb*, 148 A.3d at 483 (emphasis added).

Based on the foregoing, I believe we must interpret the *Webb* Court's holding narrowly. The *Webb* Court explicitly states only that the *Tincher* decision does not undermine the rationale that a defective design could be widespread in an industry, which I believe is distinct from the rationale the Majority relies on.[1] The *Webb* Court also stated that it "believe[s] the continued vitality of the prohibition on governmental and industry standards evidence is a question best addressed in a post-*Tincher* case." *Id.* I believe this belies the Majority's contention that the validity of the evidentiary rule in question remains intact.

_____

[1] I interpret the Majority's opinion as acknowledging this distinction. The Majority, citing different cases, delineates each rationale as follows:

We reiterated our concern that such evidence improperly placed a focus on the reasonableness of the manufacturer's conduct in making the design choice, and diverted attention from the product itself. *Webb*, *supra* at 476. Furthermore, evidence that a product itself comports with industry standards was not proof of non-defectiveness as defective design could be the industry standard. *See Lewis*, *supra* at 594.

Majority Opinion, at 12.

- 5 -

In other words, the **Webb** Court acknowledges the necessity of additional post-**Tincher** cases discussing the negligence and strict liability principles underlying the reestablishment of a bright line rule definitively barring government/industry standard evidence. Namely, it calls for cases discussing the fundamental principle underlying the decisions in **Lewis** and **Gaudio** – i.e., governmental and industry standard evidence creates a strong likelihood of diverting the jury's attention from the product to the reasonableness of the manufacturer's conduct in choosing its design. The **Webb** court simply did not rely on such a rationale in determining that the trial court erred in permitting the jury to consider FMVSS evidence following non-suit of plaintiff's negligence claim; the reasonableness calculus critical to negligence theory was sparsely discussed. **See generally Webb**, 148 A.3d at 438. Therefore, I believe the question of whether governmental/industry standard evidence is admissible in *some* products liability cases post-**Tincher** remains mostly unanswered.

It remains, though, that paramount to strict product liability theory, as **Lewis** and **Gaudio** suggest, is the understanding that liability attaches regardless of the reasonableness of a manufacturer's actions even if the defendant exercised all possible due care. **See** Restatement (Second) of Torts § 402A. Accordingly, to prove a strict products liability claim, a plaintiff need only show that a seller (i.e., a manufacturer or distributor) placed in the market a product in a defective condition. Post-**Tincher** analysis should focus on the product itself rather than the reasonableness of the manufacturing,

design, or distribution the product. Therefore, I agree that nothing in **Tincher**, as recognized by **Webb**, necessarily allows factfinders to consider governmental or industry standard evidence as dispositive in strict liability cases.

Even so, a *plaintiff* in a strict product liability action, like Maher and Roell here, may open the door to the introduction by a defendant of evidence of compliance with industry or governmental standards if a plaintiff introduces witness testimony regarding such standards during direct or cross-examination. Plaintiffs may be willing to assume this risk, but to the extent that a plaintiff introduces governmental/industry standard evidence, the opening so created should be reasonably related in scope to the substance of the offending testimony. **See Gaudio**, 976 A.2d at 544.

Here, Maher and Roell, *not* Federal Signal, proffered through Expert Struck testimony regarding industry standards for sirens, but only to show their alternative design was effective. As proffered, such evidence does not: (1) draw our attention to the reasonableness of Federal Signal's conduct in choosing its design; or (2) suggest defective designs are widespread in the siren industry. Rather, it purportedly proves that a different design that comports with siren industry standards is still effective.

In sum, I do not believe this Court's decision in **Webb** stands for the broad holding the Majority characterizes in its opinion. The **Webb** Court, multiple times, expressly states that the question of whether governmental or industry standard evidence is admissible in strict products liability cases

- 7 -

remains open. **See generally Webb**, 148 A.3d at 483. Therefore, I disagree that we must disregard the evidence in this case purporting to show Maher and Roell's alternative design is effective for purposes of the risk-utility standard. The evidence of record is sufficient to make a prima facie case that the Q-siren was defective and Maher and Roell's proposed alternative design provided as much protection to the public as the Q-siren. Thus, plaintiff's product liability claim should have survived summary judgment.

Accordingly, I would reverse the order of the trial court granting summary judgment in favor of Federal Signal.